UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| Gloria S., | ) |
| --- | --- |
| Plaintiff, | ) |
| v. | ) No. 18 CV 50095 |
| | ) Magistrate Judge Iain D. Johnston |
| Nancy A. Berryhill, Acting | ) |
| Commissioner of Social Security, | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**[1]

Plaintiff, who is now 55 years old, is seeking disability benefits arising from a workplace injury. In May 2014, while working as an activity director for the River Bluff Nursing Home, plaintiff fell over a cart as she was leaving a patient's room. She injured her left shoulder and back.[2] These two injuries were treated on parallel tracks, with separate surgeries for each. At some point, plaintiff retained her current counsel who assisted her in filing a worker's compensation claim in 2014.[3] In April 2015, plaintiff filed her disability applications in this case. At the hearing, she testified that she could walk "less than a mile" and could only stand for 15 minutes or sit for 10 minutes at a time. R. 46.

Because plaintiff raises no arguments relating to the shoulder problem, the following discussion will be confined to the back impairment. The primary doctor plaintiff saw was Dr. Nesher Asner, a neurosurgeon. This treatment took place over a year. The first visit was on January 28, 2015 and the last visit was on January 14, 2016. It is not clear why the relationship

---

[1] The Court will assume the reader is familiar with the basic Social Security abbreviations and jargon.
[2] It is not clear whether the back problem was caused solely by the accident or whether instead the accident merely exacerbated a pre-existing but unknown degenerative disc problem. But the practical outcome is the same.
[3] At the time of the administrative hearing in this case, that claim was still pending.

1

stopped when it did—a topic of further discussion below. Plaintiff also saw other doctors during and after this period. In the spring of 2015, she briefly treated with Dr. Freeman, who did one steroid injection. The injection did not help. Neither side relies on this treatment. In 2016, after plaintiff stopped seeing Dr. Asner, she continued to periodically see her primary physician, Dr. Daniel Herdeman. The parties only occasionally refer to this treatment. Plaintiff also saw several doctors for the shoulder pain.

Back to Dr. Asner: he first recommended that plaintiff do physical therapy, but plaintiff obtained no significant relief from this treatment. So, on July 1, 2015, Dr. Asner operated on plaintiff.[4] The parties agree that this surgery was successful—at least initially. *See* Dkt. #12 at 3 (acknowledging that improvement was "significant"). But the parties disagree on whether the improvement was sustained.

On August 24, 2015, nearly two months after the surgery, Dr. Asner prepared a short letter stating that plaintiff "will be able to seek employment at this time" except that there should be "no lifting over 30 lbs."[5] R.942. This letter is the key piece of evidence in this case. The ALJ relied heavily though not exclusively on it, giving it great weight because, among other things, it was from plaintiff's treating physician.[6] Although plaintiff does not say so explicitly, she seems to agree that, if this case were stopped at this point in the medical chronology, then the ALJ's decision would be based on substantial evidence.

Plaintiff offers two related arguments why the ALJ should not have relied on this opinion. The main one is that, although the surgery may have been successful initially, this success proved to be a mirage because the back problems returned sometime in the fall of

---

[4] The specific type of surgery, according to plaintiff's brief, was a right L3/4 laminotomy and discectomy.
[5] The letter provides a phone number to call if any questions arise "reading this note." R. 942.
[6] The ALJ discussed and relied on other evidence, including a State agency opinion from October 2015, but the Asner opinion is the focal point of plaintiff's arguments.

2

2015—*i.e.* after August 24, 2015 when Dr. Asner issued his opinion. Plaintiff's other argument is that opinion was always meant to be only a provisional, short-term temporary assessment, to be revised later after plaintiff got a functional capacity evaluation. Although plaintiff never explicitly argues that the ALJ should have re-contacted Dr. Asner to get an updated opinion, this is the logical extension of her argument.

The Court will begin with plaintiff's primary argument. It is mostly a factual claim. The parties' arguments unfold in a familiar back and forth sequence. Plaintiff first argues that the ALJ, in finding that plaintiff's problems continued to be mild after the surgery, engaged in cherrypicking and doctor playing. The Government (standing in for the ALJ) argues that plaintiff engages in her own form of cherrypicking. Both sides draw their evidence almost entirely from the treatment notes from plaintiff's final four visits with Dr. Asner. These took place on September 22, 2015; October 22, 2015; November 10; 2015; and January 14, 2016.

In her opening brief, Plaintiff sets forth the following facts, which were culled from these treatment notes. *See* Dkt. #12 at 5-7. At the September 22nd visit, she told Dr. Asner that her back "grabbed" at times and that her right quadriceps muscle was weak. At the November 10th visit, she told Dr. Asner that she had "climbed some stairs and had onset of right hip and leg pain." Plaintiff notes that when Dr. Asner issued his opinion in August 2014, plaintiff had a negative straight leg raising test, and denied any symptoms in her right leg, but she later had a positive test and complained about right leg pain.

Plaintiff relies most heavily on the final visit on January 14th. Plaintiff told Dr. Asner that she was still having weakness in her quadriceps, as well as thigh pain. On a physical examination, she had a positive straight leg test and a positive piriformis test and was "very tender" at the sciatic notch. R. 912. Dr. Asner wrote in his notes that they needed to "rule out

3

ongoing nerve impingement" and possible "piriformis/sciatic pain." *Id.* An MRI was ordered.[7] At this point, plaintiff states in her brief that Dr. Asner "thought" there "could be" a "sciatic or piriformis component" to plaintiff's back problem.

The above narrative in plaintiff's brief creates an implied expectation in the reader—namely, that new and perhaps definitive evidence is about to be revealed and that Dr. Asner might be on the verge of changing his opinion. If this were a classic one-hour television episode, we would be poised at the 45-minute commercial break, anticipating a dramatic resolution in the last 15-minute segment. But here, the screen frustratingly goes blank. After heightening expectations that Dr. Asner might be revising his earlier assessments, plaintiff then provides the following anticlimactic resolution: "Unfortunately, [Dr. Asner's] ultimate determination on the issue is unclear." Dkt #12 at 6. Plaintiff offers no explanation why Dr. Asner made no determination. But the record indicates that plaintiff stopped seeing him at this point. No explanations are given to the obvious question: Why? Instead, Dr. Asner disappears from plaintiff's narrative. Counsel then argues that—in *her* opinion—the MRI performed on January 19th showed that plaintiff's condition had worsened and that new problems had arisen. To be fair to plaintiff, her argument is probably more that there was at least colorable evidence showing that her condition had changed, which in turn triggered a duty on the ALJ's part to seek another medical opinion.

The Court will consider the MRI report below, but first the Court must consider what is the Government's strongest argument. The Government asserts that there was a straightforward way to establish definitively that Dr. Asner had changed his mind about his earlier opinion that plaintiff was able to work; namely, plaintiff could have "asked him for another opinion." Dkt.

---

[7] The MRI was taken five days later, on January 19th.

#17 at 7. As the Government argues, plaintiff was represented by counsel, and therefore it is reasonable to presume that this counsel "made [her] best case before the ALJ." *Skinner v. Astrue*, 478 F.3d 836, 842 (7th Cir. 2007). In making this argument, the Government acknowledges that ALJs have a duty to develop the record, but the Government argues that the Seventh Circuit has nonetheless held that ALJs may still draw the negative inference that a counsel's failure to get a new opinion means that counsel believed that "another expert would not help." *Buckhanon v. Astrue*, 368 Fed. Appx. 674, 679 (7th Cir. 2010); *see* Dkt. #17 at 7-8.

In her reply brief, plaintiff only briefly responded to the Government's arguments. Plaintiff did not distinguish the cases cited by the Government, nor offer any contrary cases, nor dispute the general proposition that a negative inference may be drawn under these circumstances.[8] Instead, plaintiff made the following argument: "Plaintiff had no warning that the ALJ was going to rely so heavy on what is *clearly not* a decisive opinion on Plaintiff's residual functional capacity." Dkt. #18 at 1 (emphasis in original). This argument rests in part on plaintiff's second argument below, one that the Court finds is not convincing. But putting this point aside for now, the Court finds it implausible that plaintiff's counsel, who is keenly aware of the important role that treating physician opinions usually play in disability cases, had no inkling that the ALJ might rely on this opinion. The opinion was in a letter format, on a separate page. It was not, as is sometimes the case, an isolated passing sentence buried in a long paragraph of treatment notes. Even if one could believe the claim that plaintiff's counsel did not know, *before* the ALJ issued his decision, that he would rely on Dr. Asner's opinion, counsel indisputably became aware of that fact *after* he issued the decision. Yet, when counsel filed her letter brief to the Appeals Council, she did not raise any arguments that the ALJ had erred in relying on Dr.

---

[8] To be clear, the ALJ did not explicitly draw this inference. So, the Government's argument may be more fairly characterized as a harmless error argument.

5

Asner's opinion. R. 170-71. She did not argue that the ALJ should have sought an updated opinion from Dr. Asner. These arguments were only raised for the first time in this Court.[9]

Turning back to plaintiff's claim that the ALJ "ignored" the post-surgery evidence supposedly showing that plaintiff's condition had deteriorated, the Court notes that the ALJ, in fact, did acknowledge much of the evidence plaintiff now relies on. The ALJ included a paragraph discussing it, specifically referring to the examination findings from the critical January 14th visit, as well as the results of the new MRI. The ALJ noted that plaintiff had a positive straight leg raising test and exhibited some tenderness over the sciatic notch. R. 24. The ALJ, while acknowledging these facts which were contrary to his theory, also pointed to other facts from the same examination. The ALJ stated, for example, that plaintiff rated her pain at this last visit as only a 2 on a 10-point scale, a rating characterized as "mild." The ALJ also noted that plaintiff only took pain medication on an "as-needed basis," which the ALJ characterized as a "limited use of medication," and that plaintiff "was not referred to a pain management specialist." These facts support the ALJ's conclusion that plaintiff's condition had not materially changed since Dr. Asner gave his opinion. Plaintiff's cherrypicking argument is weakened by the fact that she did not, in either of her two briefs, acknowledge these contrary facts.[10]

---

[9] Plaintiff did argue in this letter brief that the ALJ should have called a medical expert at the hearing, but the reason cited for needing an expert was to assess whether plaintiff equaled Listing 1.04(A). R. 171. Here, plaintiff raises no arguments under this listing.

[10] In reviewing the record, the Court notes that additional statements in the medical record could have been cited by the ALJ to rebut plaintiff's deterioration thesis. *See, e.g.*, R. 998 (May 9, 2016 Dr. Herdeman visit: "[plaintiff] is a 52 year old female with prior shoulder and back injury. Still has pains *but not as severe as previously*.") (emphasis added); R. 995 (although plaintiff told Dr. Herdeman on November 9, 2016 that she still had some "distracting pain," she refused the doctor's offer to try physical therapy or a steroid injection). Moreover, the ALJ did not cite to Dr. Asner's statement from the notes of October 22, 2015 visit where he stated that there were then "no activity restrictions from [his] point of view." R. 989. This statement arguably undermines plaintiff's claim that her deterioration began as early as September 2015. Because the ALJ did not rely on these facts, the Court has not considered them in the analysis here. But if this Court were to remand the case, these facts would present additional obstacles to plaintiff's case.

Perhaps plaintiff's best argument for a remand is the narrowly targeted claim that the ALJ improperly played doctor in interpreting the January 19th MRI. The ALJ concluded that this MRI did not show any significant new abnormalities from prior reports. Plaintiff, who is in some sense also playing doctor, argues that the report revealed material new changes. She notes that the report mentioned "fibrosis," and then faults the ALJ for not acknowledging this finding. Plaintiff relies on a website stating that "fibrosis has in some contexts been noted to be correlated with a 'poorer outcome in lumbar disc surgery.'" Dkt. #12 at 7. This statement, it should be noted, speaks in vague generalizations. Also, plaintiff did not cite to any cases to support her argument. However, plaintiff easily could have cited to—and presumably is relying on—several recent cases where the Seventh Circuit has remanded because ALJs improperly interpreted MRI results. *See, e.g., Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014) (ALJ failed to submit MRI, which was "new and potentially decisive" evidence, to the "medical scrutiny" of an expert); *Akin v. Berryhill*, 887 F.3d 314, 317-18 (7th Cir. 2018) ("The MRI results may corroborate Akin's complaints, or they may lend support to the ALJ's original interpretation, but either way the ALJ was not qualified to make his own determination without the benefit of an expert opinion.").

The Government responds with a multi-part rebuttal. The Government first claims that the ALJ merely recited the results of the MRI report verbatim, and therefore supposedly did not engage in any substantive analysis. Dkt. #17 at 8. With regard to the reference to "fibrosis," the Government asserts, relying on a different medical website, that "fibrosis is simply adhesion or scar tissue that is common after lumbar spine surgery." *Id*. In response to cases such as *Goins*, the Government digs into the case law and finds what perhaps could be characterized as a contrary line of cases where the court has affirmed even though ALJs evaluated MRI reports. For example, in *Olsen v. Colvin*, 551 Fed. Appx. 868 (7th Cir. 2014), the Seventh Circuit affirmed

7

even though the ALJ had "summarized the results of each MRI and drew a conclusion from those diagnostic tests that Olsen's abnormalities mostly were mild." *Id.* at 875. The Seventh Circuit there noted that the claimant there did "not point to any medical source showing that the ALJ misconstrued the MRIs." *Id.* But the Government does not offer a clear way to reconcile these two seemingly inconsistent lines of cases.

After considering these arguments, under the facts of this case, the ALJ's discussion of the January MRI is not a sufficient reason to remand. Plaintiff has not disputed the Government's claim the ALJ's summary was a verbatim recitation of the MRI report, nor has plaintiff argued that the ALJ made any factually incorrect claim. Plaintiff believes that the ALJ should have discussed the fibrosis reference, but this argument is vague and speculative. More broadly, in plaintiff's reply brief, she did not respond in any way to the Government's multi-part MRI argument, thereby raising a question whether this argument has been forfeited altogether. But the strongest weakness in plaintiff's argument is the one noted above—neither plaintiff nor her counsel ever followed up with Dr. Asner to get *his* interpretation of the report. He could have provided the medical opinion she claims she was seeking.

The Court finally addresses plaintiff second argument why the ALJ should have disregarded Dr. Asner's opinion. Plaintiff argues that Dr. Asner's opinion was "not clear" even at the moment it was issued because Dr. Asner separately stated, in his treatment notes, that plaintiff "will eventually need [a] Functional Capacity Evaluation for unemployment/SSDI." R. 515. Plaintiff argues that this statement was functionally an addendum or qualification to the letter opinion, indicating that further revisions were likely. In other words, the opinion was merely a first draft.

The Court is not persuaded by this argument. For one thing, it runs counter to basic principles of plain language interpretation. When reviewing the explicit language of the letter itself (*i.e.* looking within the four corners of the document), one cannot find any language stating or even suggesting that the opinion was contingent on further testing. The letter did include one explicit qualification (no lifting over 30 pounds), which suggests that Dr. Asner was capable of including qualifications if deemed appropriate. Under plaintiff's theory, Dr. Asner chose an awkward roundabout way of expressing his overall opinion.

This problem aside, another stumbling block is determining what Dr. Asner meant by this one isolated comment. It is not obvious to this Court. Plaintiff seems to believe that the doctor expected that plaintiff would perform poorly on the functional capacity evaluation so that it would then become clear that she was disabled and could not work full-time. If so, then why would Dr. Asner bother issuing the opinion in the first place if it were to be soon rendered obsolete? Another possible interpretation—one that undermines plaintiff's theory—is that Dr. Asner was not convinced that plaintiff was disabled, but was telling her that, if she believed otherwise and still wanted to pursue her claim, she would need to take the extra step of getting a functional capacity evaluation. In short, he was giving her a roadmap on how to bolster her possible claim.

But where this line of argument flounders is, again, at the critical point in the analysis. Instead of speculating about what a functional capacity evaluation *might* have revealed, one reasonably could wonder what the evaluation *in fact* revealed. Frustratingly, there is no answer to this question because plaintiff never got the evaluation done. This would have been an easy way to resolve the ambiguity discussed above. Plaintiff has not offered any explanation for the failure to develop this part of her case. At the hearing, the ALJ asked about whether plaintiff had ever

received a Functional Capacity Evaluation. Plaintiff stated that she had not, but then did not go on to explain why not. R. 43. Her counsel noted that there was a reference in the record to the possibility of getting one, but counsel did not believe it had ever been done. However, like plaintiff, counsel did not offer any explanation. In her briefs, plaintiff glosses over this issue, stating only vaguely that a functional capacity evaluation "had not happened yet." Dkt. #18 at 1. Plaintiff dangles the possibility that she will "yet" get around to doing the evaluation, but she provides no specific timetable, nor any explanation for the long delay.

In sum, the Court is not persuaded by plaintiff's two arguments as to why the ALJ erred in relying on Dr. Asner's opinion letter, nor is the Court persuaded that the ALJ failed to fully or fairly consider the post-surgery evidence as plaintiff claims. As noted previously, Dr. Asner's opinion was not the only evidence relied on by the ALJ, but it is the area on which plaintiff chose to focus her arguments.

## CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is denied; the government's motion is granted; and the decision of the ALJ is affirmed.

Date: June 11, 2019         By: _____
                                Iain D. Johnston
                                United States Magistrate Judge